Anderson, J.,
delivered the opinion of the-court.
The bill represents that Anderson Crump died in 1852; that Kathaniel L. Savage qualified as his executor, and died on the 4th of January, 1853 ; that on the 14th of April, 1853, James Stamper qualified as administrator de bonis non with the will annexed of the said Anderson Crump, who “ owned and possessed a very large and valuable estate, consisting of lands, slaves, debts due to him, household and kitchen furniture, crops of corn, &c., and a large and valuable stock of horses and mules, cattle and hogs, &c., all of which (the bill alleges), or the proceeds of the sales of all of which, and the hires of the slaves for many years, went into the hands and possession of the said James Stamper as administrator de bonis non as aforesaid.” *552 And. the bill charges that the said James Stamper, administrator de bonis non as aforesaid, collected many .large sums of money that were due to said Anderson Crump, deceased, in his lifetime, and that he collected large sums of money arising from the sales of the said perishable property and the hires of the slaves of 'the said Anderson Crump, deceased, and departed this life in 1857, without ever having settled any account of his transactions as the administrator de bonis non with the will annexed of Anderson Crump, deceased, largely indebted to the estate of said Crump; that the plaintiffs are the legatees of said Crump, and entitled to a distribution of whatever is due from the estate of the said Stamper ; that Ilenry X>. Vaiden is the personal representative of the said James Stamper, deceased, who, together with the widow and children and heirs of James Stamper, deceased, are made defendants to the bill, and said Yaiden required to state, render and settle up an account of the administration de bonis non of James Stamper on the estate of Anderson Crump, deceased.
The record does not show the precise date of the death of R L. Savage ; but it must have been prior to the 14th of April, 1853, at which time letters of administration de bonis non with the will annexed of the estate of Anderson Crump were granted to James Stamper; and it shows that the said Stamper died about the 20th of September, 1856, instead of in 1857, as alleged by the bill. The record shows also what does not appear on the face of the bill, that E. A. Savage, the widow of R. L. Savage, qualified as his executrix, and that James Stamper acted as her agent in the administration of the estate of the said R. L. Savage, and after her death, which occurred prior to the 14th day of April, 1853, qualified as her executor. Ror does it show, as appears in the record, that after the death of *553 James Stamper Robert Howie administered on his estate, and John S. Lacy qualified as administrator de bonis non with the will annexed of Anderson Crump, and that both of them died long before the institution of this suit; that after his death Leonard C. Crump qualified as administrator de bonis non of James Stamper, deceased, and that some years after his qualification his letters of administration were revoked, and the estate of James Stamper, as the bill does allege, was committed to the administration of H. L>. Vaiden, sheriff of New Kent county, one of the defendants.
Hor does the bill show that the records of the courts of New Kent county, where the evidences of these various administrations, the transactions of H. L. Savage, the executor of Anderson Crump, of A. E. Savage, his executrix, through her agent, James Stamper, of James Stamper, as her executor, and as administrator de bonis non, with the will annexed • of Anderson Crump, deceased, of Robert Howie, his administrator or executor, and of John S. Lacy, who succeeded him as administrator de bonis non, with the will annexed of Anderson Crump, deceased, could have been found, were all destroyed by fire by the enemy during the late war. But these facts are fully set out in the answer of Mrs. Martha Stamper, the widow of James Stamper, deceased, and two of their children, and are established by the proofs in the record.
Erom this simple narrative of the facts, it is manifest that after this grpat lapse of time, and the destruction of the records, when the voices of the actors in all these transactions are silenced in the grave, and there are no witnesses who were cognizant of the transactions and capable of throwing light upon them, living to testify, it would be extremely difficult, if not *554 impossible, for any commissioner to state an account, which would do justice to all concerned. This suit was not brought until August, 1871, nineteen years after the death of Anderson Crump, and the qualification of his executor, eighteen years after the death of H". L. Savage, and the qualification of James Stamper as administrator de bonis non of Anderson Crump, fifteen years after his death, and nearly ten years after the death of Robert Howie, his executor or. administrator. The defendants demurred to the bill, and upon the facts set forth in their answer, resisted the right, of the plaintiffs to an' account. They say that “ the-papers of said Stamper have been so lost and otherwise made way with that it would be impossible at this late day to settle the transactions of said Stamper as the administrator of Anderson Crump; that'said Stamper was a good accountant, being a commissioner of the court, and. there is scarcely a doubt but that he regularly settled his accounts and returned them to-the court, but all the papers of that office have been destroyed; and the great lapse of time since the qualification of said Stamper renders it still more impossible to settle said accounts, without doing great, injustice to the estate of said Stamper; and inasmuch as this suit was not instituted for nearly twenty years, after the qualification of said Stamper, and sixteen years after the death of said Stamper, the court should, dismiss said bill; for if the claim be not barred by the statute of limitations (on which they relied as one of the grounds of demurrer) it is clearly lost by their laches.”
But the court directed an account, and the commissioner undertook to make it out, and reported an account charging the estate of James Stamper with a large balance, which the court sustained and decreed *555 in favor of the plaintiffs, the legatees of Anderson Crump; from which decree this appeal was allowed.
It appears that 'William P. Richardson was the per- . sonal representative of Robert Howie, who wras the executor of James Stamper, and that Yaiden, after the estate of Stamper was committed to him, found a parcel of loose papers which had been in the possession of Howie, as executor of Stamper, scattered over the floor of Richardson’s office and desk (probably by Federal soldiers who had possession, and committed great depredations), which he afterwards turned over to Commissioner Barham, who had been directed to take an account in this case. Among this rubbish, not destroyed by the enemy, were found the papers exhibited and designated M O H, and H O M, an old memorandum book, and the paper J D C. The two first are in the handwriting of James Stamper, and purport to be settlements of his administration account for the years 1858 and 1854, showing a balance due from him to the estate on the 1st of January, 1855, of $1,289.26. He is charged with the whole of the hires of the slaves for 1853, due in 1854, though he held the bonds of two of the legatees for hires, with which he ivas not credited. The paper JDC purports to he an unfinished and incomplete statement of the administration account for the following year. It begins with the debit of $1,289.26, balance due from the administrator on the 1st of January, 1855, cedits him by certain payments made during the year, and debits him with the hires of 1854, collectable in 1855. This paper is proved to be in the handwriting of J. 13. Christian, but is not signed. No balance is struck, but the account is left in an unfinished state and is not closed. Why did not the commissioner go on to complete the account ? The probability is that there were other matters to be stated which the administrator was not then prepared to show, and that, in all probability, was the *556 disbursements of the negro hires. It cannot be perceived for what else the account was kept open. Hut is it - likely, is it probable, that James Stamper would have allowed it to remain long in this unfinished state ? He lived until the 20th of September, 1856, and when we remember with what promptness he had his administration accounts for 1853 settled (he only qualified in the spring of that year), and his accounts for 1854 settled, and with what promptness he commenced the settlement of his accounts for 1855, and his general habits of business as exhibited in the record, we are forced to the conclusion that he would not have suffered this settlement to continue unfinished during the remainder of his life, which gave him ample time to have had the settlement concluded and put upon record, as his previous settlements were.
JSTo other papers have been recovered from the wreck of his papers and the destruction of the records which throw any light upon his subsequent transactions and dealings as administrator de bonis non of Anderson Crump, deceased. They are all buried in the impenetrable darkness of the dead past. I am not unmindful that there is another paper exhibited, and designated Q S, upon which the commissioner relies, and makes the basis of subsequent charges against the administrator. It purports to give the hires of the servants for the year 1855, due in 1856. The commissioner certifies that it “is a true copy of a memorandum in the handwriting of John H. Christian,taken from a book marked ‘ledger.’” Whose book it was does not appear; and it does not appear even to be signed by J. 1). Christian, or that there was any privity between him and Stamper, or that he had any authority to make the statement, or that Stamper ever gave his assent to if, or had any knowledge of it. And yet the commissioner holds him bound by it, only, for aught) else that appears, because it is in the- hand *557 writing of Christian—which it might be and not be an affirmation of said Christian, which would be no evidence against Stamper even if it was. True there is another exhibit, the memorandum book before mentioned. But between it and the settlements M O TI and Ii O M, there are discrepancies which show that it is too inaccurate to be relied on as the basis of an account or the foundation of a decree.
But the paper Q S puts the hires for 1855, which is adopted by the commissioner, at $400 more than they are charged in said memorandum book. It is true the hires of four men are charged that are not charged in the memorandum book. But non constat that those hires were ever received by the administrator, for reasons which cannot now be explained, or that they were properly chargeable to him.
To complete the account, the commissioner charges Stamper with all the hires of 1856, although they were not due until after the death of Stamper, and could not have been received by him; and if there is any evidence in the record that they were charged to his executor as assets of Stamper, I have unconsciously overlooked it. I do not think that it anywhere appears that Stamper’s estate got the benefit of those hires, whatever they may have been. There is no proof as to their amount; and in the absence of all proof the commissioner had to rely on estimates and conjecture; and his estimate of the hires of 1856 are $314.75, minus $11.25, more than the actual hires for the previous year are stated to be by the paper Q S, and $703.50 more than James Stamper is charged with for the year 1855, next preceding, in the said memorandum book. I find nothing in the record to warrant such an extraordinary advance upon the hires of the previous year.
The commissioner also puts the estimated expenses for the chargeable servants for the year 1856 at much less *558 than the actual expenses are stated for the previous year. The actual expense sums up $230; the estimated, for the following year, only $182.50—a difference of $47.50. The same is true with regard to medical attendance. The actual amount for 1855 sums up $118.50; the estimated amount for 1856 only $47; and for 1857, $58—a difference for one year of $71 ; for the other, of $60.50.
The commissioner has also gone behind the settlement of 1854 to debit the administrator with the sum of $334.34, which was due from William E. Savage to Anderson Crump. E. L. Savage was the executor of Crump, and was individually indebted to W. E. Savage in a much larger amount. James Stamper represented both estates—the latter as administrator de bonis non, and the former as agent for his executrix; and the estate of Anderson Crump may have gotten the benefit of the debt due it from W. E. Savage in the settlement which Stamper made of E. L. Savage’s administration on it, which would account for his not debiting himself with that amount as administrator of Crump in his settlement of 1854. After such a lapse of time, and the obscurity thrown upon these transactions by deaths, and the destruction of records, and the loss of papers, a settlement ought not to be surcharged and falsified because some of the transactions cannot be now clearly and fully explained.
But these objections are secondary and inconsiderable, in view of the great and overwhelming objection of stating an account to charge a dead man’s estate, upon only partial evidences of his transactions, and partial settlements now only extant, whilst other and important evidences of his transactions, and of further and fuller settlements, which were in all probability made and placed on record, have been lost, and cannot now be produced, because of the destruction of the records by fire, *559 and the seizure and pillage of his private papers by a licensed soldiery.
In Foster's curator v. Rison & al, 17 Gratt. 321, Judge . Moncure said, p. 347: “ Something may be due; I might go further and say, that probably something is due from the estate of John W. to the estate of John Foster on account of the transactions stated in the bill. But the possibility, or even the probability that something is so due, is not enough to entitle the plaintiff to an account. Independently of the bar of the statute, it would be a sufficient answer to his claim for an account that one cannot now be settled with any reasonable expectation of doing justice to the defendant, and that the plaintiff’s testator is in fault for not having sooner asserted and prosecuted his claim. It may be said that John W. Foster was also in fault for not having himself rendered and settled an account. Non constat that he did not render and settle an account.”
These principles are eminently applicable to this case. It is easy to see that if the records of the courts of New Kent county had not been destroyed, they might have poured a flood of light upon these transactions, which would have brought the commissioner to very different conclusions; and which, too, would have been more consonant with the reasonable presumptions of the case.
It is incredible, if these large balances were due the plaintiffs by James Stamper in his lifetime, that they would not have asserted their claims long ago.
What was there to prevent them instituting their suit more than twenty years ago, in the lifetime of James Stamper, or immediately after his death, in the lifetime of his executor, to assert this claim for a large balance due them, and demanding a settlement ? His transactions were then probably manifested by the records of the court, and if not fully disclosed, could have .been satisfactorily explained by living witnesses. If they had *560 this large balance in the hands of James Stamper, he had ample money to pay it, and they were not so plethoric that they could afford to lie out of it. They appear to have been in needy circumstances, and if this money was lying in the hands of Stamper, it was certainly as well knowm to them as now, and they would hardly have been content to let it lie there. They were under no disability to sue, and would hardly have slept on their rights for such a length of time. 13ut we do not hear of their ever claiming such indebtedness until the bringing of this suit—after the destruction of the records, •the death of the actors and of others who might have thrown light on the transactions.
Some papers have been found amongst the wreck of Robert Howie’s papers, which show” that they had settlements with him of various transactions, in which his testator was an actor. Settlements wrnre made between them, and receipts executed by them to him for the several amounts which appeared to be due them from the estate of James Stamper. If Stamper wras owing them these large balances now7 claimed, is it not likely that they would then have insisted upon the settlement and payment of them too? If there was anything due them, the presumption is that they then claimed it, and that it was then settled and paid to them, and that the evidence of it is among the rifled and lost papers or burnt records; and this conclusion is confirmed by the fact that they furnish no evidence, after the foregoing settlements and payments to them by Howie, that they set up any claim in the lifetime of Howie to other balances due them from the estate of Stamper; and by the virtual disclaimer of Mr. Howie, not long before his death, when he stated to Mrs. Frazier that he had settled up and paid all the debts due from James Stamper’s estate, except two or three small debts, w'hich he intended to pay in a short time.
*561 But as an offset to these conclusions, it is said that there was a controversy as to the title of the slaves, and that a suit was depending in the circuit court of. New Kent county to decide to whom they belonged, and that the papers in that suit were lost in the general conflagration of the records of the court. It seems to be conceded that there was such a suit; but when and by whom brought, and against whom, and how decided, or whether decided or not, there is nothing to show. It is most likely that the suit was brought by the legatees of Kobert Crump, the father of Anderson Crump, under whose will, which was lost in the burning, they claimed against the plaintiffs, legatees of Anderson Crump; and if brought in the lifetime of James Stamper, who had possession of the slaves, he was a defendant, and if after his death, J. S. Lacy, his successor as administrator de bonis non of Anderson Crump, would have been a defendant; and also Kobert Howie, the administrator of Stamper, would have been a necessary party to account for the hires his testator had received. It is most probable that the suit was brought in the lifetime of Stamper, and was probably decided against the plaintiffs, as they seem to have abandoned the claim. "We hear of them making no claim to the slaves or the hires after they came to the hands of J. S. Lacy. The presumption is that not only the question of title, but the account of hires, was settled in that suit; that James Stamper, or his executor, Kobert Howie, was required to render an account of the hires that were in the hands of Stamper, and paid them to a receiver, under the order of the court, or to the party who it was decided was entitled to the slaves. How else can it be accounted for, that when Howie settled up other transactions of his testator with these plaintiffs, they made *562 no demand for the settlement of the hires also ? If it should he said that the suit was not decided, then it was the duty of the court to have ordered an account of the hires, and directed what appeared to he in the hands of James Stamper to he paid into court, and it must he presumed that what ought to have been done was done. The controversy with regard to the title to the slaves, or the pending of the suit, does not repel or weaken the presumption upon the grounds before stated, that the plaintiffs had received payment of all that was due them. But the fact that such a suit had been depending, in connection with the conduct of the plaintiffs in never requiring payment from the executor of James Stamper or of his administrator de bonis non, until after the death of the parties against whom they claim, and the death of witnesses, and the destruction of the records, gives greater force to the presumption that there was nothing due to them from the estate of James Stamper. It is so improbable that the plaintiffs would, under the circumstances disclosed and hereinbefore alluded to, have slept on .their rights and never have claimed moneyas due them in the hands of the representatives of James Stamper during the long lapse of time from 1856 to 1871, that it raises a strong presumption that there •was nothing due them, .and the inability of the defendants to produce receipts or other evidences of payment,. under the circumstances of the loss of papers, and the destruction of the records of the court, where such evidence would probably exist, is not entitled to he weighed against that presumption.
It is a rule of equity not to encourage stale demands, or to give relief to parties who sleep on their rights. Iso precise limit of time can be stated within which the interposition of the court must be sought. What is a reasonable time cannot well be defined so as to establish *563 any general rule, and must, in a great measure, depend upon the exercise of the sound discretion of the court, under all the circumstances of each case. In Gregory v. Gregory, Coop. 201, Sir William Grant, M. R, refused to set aside a purchase by a trustee, after a lapse of eighteen years. In Lord Selrey v. Rhoades, 2 Sim. & St. R. 41, when a lease was granted to a steward, and eleven years had elapsed, the court refused to set the lease aside, though there were special circumstances in the case. So in Baker v. Reed, 18 Beav. R. 398, a bill filed after the lapse of seventeen years to set aside the purchase of a testator’s estate by his executor at an undervalue, was dismissed on the ground of delay. Kerr on Frauds, p. 303, and numerous cases cited. Parties who would have had the clearest title to relief had they come in reasonable time, may deprive themselves of their equity by a delay which falls short of the period fixed by the statutes. Ib. p. 305, and cases cited.
In Carr’s adm’r, &c. v. Chapman’s legatees, 5 Leigh, side p. 164, Judge Carr elaboratly reviews the decisions on this subject, English and American. "We beg leave to refer to his opinion with only this brief citation. He remarked: “Equity, always averse to stale claims, will not be called into activity in aid of legatees after great length of time, especially if the original parties are all dead and their representatives allege their inability to furnish the accounts.” The bill in that case was not filed until twenty-eight years after the death of the first testator, hut from twelve to twenty years after some of-the plaintiffs attained full age. In the case in hand the leg7 atees not only delayed bringing suit' until all the original parties were dead, hut until all the records of the courts were destroyed, which were the repositories of the evidences upon which the defendants might have relied to show that their intestate and ancestor had faithfully discharged his fiduciary obligations. In the case cited the *564 decree was reversed and the bill dismissed, although some of the plaintiffs had delayed only twelve years in bringing suit after their disabilities were removed.
In Pickering v. Lord Stamford, 2 Ves. Jr. R. 581, the master of the rolls said “that parties shall not by neglecting to bring forward their demands put others to a state of inconvenience, subjecting them to insuperable difficulties. Against such a bill, undoubtedly, the court ought to set its face.” “If from the plaintiff’s lying by it is impossible for the defendants to render the accounts he calls for, or it will subject them to great inconvenience, the plaintiff must suffer, or the court will oppose what I think the best ground—public convenience.” The foregoing is cited with approval in Hayes v. Goode, 7 Leigh, 452, 487, and by Allen, J., in Caruthers’ adm'r v. Trustees of Lexington, 12 Leigh, 610, 618. In the latter case Allen, J., said: “No particular period is fixed by the cases as limiting the demand for an account. If from the delay which has taken place it is manifest that no correct account can be rendered, that any conclusion to which the court can arrive must be at best Jbut conjectural, and that the original transactions have become so obscured by time and the loss of evidence and the death of parties as to render it difficult to do justice, the court will not relieve.” That, it seems to me, is emphatically this case. The original transactions have become so obscured by time and the loss of evidence, the total destruction of the records of the courts, the death of the actors in those transactions, and the death of witnesses, as that the account, which is the basis of the decree, is stated in great part upon conjectural estimates and upon partial and .incomplete settlements, showing balances against him, in the absence of evidence of further and subsequent settlements, which were in all probability made and entered of record, which would show the satisfaction of the balances appearing to be due from *565 the administrator on the previous settlements, every trace of which has been destroyed in the conflagration of the records of the court—involving in the destruction the records of a suit, which is known and admitted to have been depending, which would have required the further and final settlement of the administrator’s accounts involved in this controversy, and which it is reasonable to presume, under all the circumstances of this case, were settled and paid into court or to the parties entitled thereto.
The same doctrine was reiterated by this court in the recent case of Harrison & als. v. Gibson & als., 23 Gratt. 212. And Judge Staples, speaking for the whole court, said: Although the time which has elapsed since the death of Mrs. Wagoner may not of itself constitute a statutory bar to the claim, still the unaccountable neglect of the parties for fourteen years thereafter to prosecute any suit, when considered in connection with the other circumstances, is very persuasive against the equity and justice of that claim. I think they fully justified the court below in dismissing the bill.
The plaintiffs below, by their delay and gross laches in asserting their claim, until by the destruction of the records of the courts, and the loss of papers, and the death of the actors in the transactions, and of important witnesses, it is not only inconvenient and difficult, but impossible for the defendants, as they aver, to state an account which would do justice to the estate of the decedent, and the court in decreeing an account upon such imperfect and defective material would incur the hazard of doing great injustice to the estate of one who has been dead for neai’ly a quarter of a century, have not shown themselves entitled to the assistance of a court of equity. It is a well established principle governing a court of equity, 'that' nothing can call it forth into activity but conscience, *566 good faith and reasonable diligence ; where these are wanting the court is jaassive and does nothing.' It always refuses its aid to stale demands, where the party has slept upon his rights and acquiesced for a great length -of time. There is no precise limit of time prescribed, but each case must depend on its circumstances, and the destruction of records and the loss of evidence and the death of parties and witnesses to the original transactions prior to the assertion of the claim, are circumstances to he weighed in connection with the delay in determining whether a court of equity should give the plaintiffs the assistance which they invoke. These circumstances I have reviewed, and upon the whole am of opinion to reverse the decree and to dismiss the plaintiffs’ bill.
Burks, J.
I do not concur in much that is said, and not at all in the conclusion reached in the opinion just delivered by Judge Anderson. Notwithstanding the lapse of time, death of parties, and loss of papers, I think the record furnishes matei’ial for an account on which a decree might be based doing substantial justice. The only matters in controversy are the hires for the years 1853, 1854, 1855, and 1856. The papers W O II and H O M purpoi’t to be accounts stated between Stamper and the estate of his intestate for the years 1853 and 1854. They are in the handwriting of Stamper, and no doubt are correct copies of the accounts duly stated by Christain, the commissioner. The hires and expenses of the negroes for the year 1853 are embraced in the last of the two accounts as shown by the paper H O M. The balance against Stamper', as shown by this last-named account, was $1,289:26 as of the 1st day of January, 1855. There can be no doubt then as to the hires and expenses for 1853. Bor the hires and expenses of 1854, we have several papers which show with sufficient accuracy what *567 they were. There are exhibits J D C, A 13 X Y, and Q S. Exhibit J D C is proved to be in the handwriting of the commissioner (Christian), who stated the of the two preceding years. It purports to be the account of Stamper with the estate of his intestate for the year 1855. It is true no balance is formally struck, but it sets out the debits and credits with minuteness, showing the hires of all of the negroes in detail for the year 1854, and also the expenses for that year. A E X Y is an extract from the private account-book of Stamper, in which are set down, in Stamper’s own handwriting, the hires of three of the slaves for the year 1853, and all of them for the years 1854 and 1855.
Q S is, an extract from a ledger in the handwriting of the same commissioner, Christian. It is a statement of the hires for the years 1855 and 1856. Now, these hires, char’ged in the paper JD C, correspond with the statements contained in A B X Y and Q S. The papers taken together show with sufficient certainty what were the hires for all four years. There is no direct evidence of the expenses for the last two years, 1855 and 1856, but a reasonable estimate of them can be made from the papers before referred to. The commissioner, in stating the accounts, was guided and controlled chiefly by those papers, and the results reached by him cannot be far out of the .way, if at all. Certainly Stamper owed a balance of $1,289 as of the 1st day of January, 1855. The undisputed, settled account, II O M, shows that fact. The balance shown by the settlement by the commissioner in the court below as of that date is some $300 in excess of the balance stated in the account H O M.- Perhaps this last named balance should have been adopted by the commissioner and court as the true balance, and the accounts reported corrected in that particular, and it may be in some other matters of minor detail. The accounts stated any way on just principles would show *568 a lage balance due the appellees. There is no evidence showing or, as I think, tending with any force to show, that these hires have ever been paid. While so much stress is laid upon the loss of papers, it is remarkable that the papers produced in the cause, while they show settlements between Stamper and the appellees, and between Stamper’s representative and the latter, they show no accounting for hires.
These settlements, as the papers abundantly show, I think, related exclusively to the payment to the appellees of what was coming to them on account of the sales of the perishable property of Crump’s estate and the sale of land. Out of the moneys arising from these sources were deducted the bonds of the appellees given for the hires of the slaves, showing, inferentially, at least, that the hires were not paid. It is very strange that while the papers relating to these settlements are found and show very satisfactorily the disposition of the funds arising from the sales of the perishable property and of the land, no receipts or other papers showing or tending to show the payment of the hires -were ever found or produced, if such payment was made. The dispute about the title to the slaves would sufficiently account for the non-payment of the hires. A suit involving the title was pending when Stamper died. It is not to be presumed that Stamper would hazard a payment of the hires to the litigants on either side until this dispute was'settled: It was not settled in Stamper’s lifetime nor in the lifetime of his first representative, Howie, who died in 1862, and the question of title is now made in this very case. The possibility that Stamper might have accounted for these hires in the suit brought-by Robert Crump’s legatees, the papers in which suit have been burned, does not, I think, raise a presumption on which a decree can be safely based. At most, it is a *569 mere conjecture. If Stamper had, as suggested, paid the money into court in the case referred to, the probability is there would have been some trace of the payment, some receipt or other paper or papers giving at least some clue. There are none such.
I do not think this is a case of such laches as to prevent the equitable relief sought. Stamper died in September, 1856. About four years or four and half years intervened before the commencement of the war. The war lasted four years. Stay-laws were in force for four years longer. Laches cannot be imputed during these periods; at least, the existence of war and the partial suspension of remedies for about eight years were circumstances to be considered in determining the question of laches. We have so held in several cases. This suit was instituted about two years after these obstructions were removed, and in 1868 the complainants had filed a petition touching the title to the slaves in the suit of Stamper v. Lacy, which petition was rejected without passing on the merits. If laches can be predicated of any period, it is of the four and half years that elapsed before the war. I do not think the failure for four years to call ■a fiduciary to account is such laches as to protect his estate from accountability, although by reason of war, death, destruction and loss of papers, there may be ■some difficulty in the settlement of his accounts.
Such are my views, in part, in this case, hastily ■sketched this morning and imperfectly stated. If the ■case be reported, I reserve the liberty of writing out my opinion more fully and carefully.
Staples, J., concurred in the opinion of Burks, J.
*570 The decree was as follows :
The court is of opinion, for reasons stated in writing and filed with the record, that the decree of the circuit court of New Kent county is erroneous. It is therefore-ordered and decreed that the decree aforesaid be reversed and annulled, and that the appellees pay to the appellants their costs expended in the prosecution of • their appeal here. And the court proceeding to render such decree as ought to have been rendered by the court below, it is adjudged, ordered and decreed that the plaintiffs’ bill be dismissed with costs.
Decree reversed.